IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION CASE NO. **09-CV-60938-Cohn-Seltzer**

FIRST FASHION USA, INC.                  :
                                         :
        Plaintiff,                       :
vs.                                      :
                                         :
BEST HAIR REPLACEMENT                    :
MANUFACTURERS, INC.,                     :
EDWARD S. SMITH, JR.,                    :
HAIR BY MAIL, INC.,                      :
BARBARA CUTSUMBIS,                       :
ANTHONY B. KILLINGS,                     :
PC SOLUTIONS OF SOUTH FLORIDA,           :
INC., and                                :
KENNETH B. HEILMAN,                      :
                                         :
_____Defendants._____      :

FILED by ___*VT*___ D.C.
ELECTRONIC

**June 25, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## PLAINTIFF FIRST FASHION USA, INC.'S MOTION FOR PRELIMININARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, FIRST FASHION USA, INC. ("First Fashion") seeks an order preliminarily enjoining Defendants, BEST HAIR REPLACEMENT MANUFACTURERS, INC. ("BHRM"), EDWARD S. SMITH, JR. ("Smith"), HAIR BY MAIL, INC. ("HBM"), BARBARA CUTSUMBIS ("Cutsumbis"), ANTHONY B. KILLINGS ("Killings"), PC SOLUTIONS OF SOUTH FLORIDA, INC. ("PC Solutions"), and KENNETH B. HEILMAN ("Heilman"), (collectively "Defendants") from continuing to infringe and dilute First Fashion's famous and distinctive trademarks, and from committing acts of unfair competition and other unlawful conduct associated therewith, and files the Declaration of Wendy Wan, and states as follows:

### Need for Expedited Treatment

Defendants, led by Defendant Smith, a rogue shareholder and former President of First Fashion, have stolen First Fashion's famous SUNCREST trademark for hair replacement products and sent false and defamatory letters to First Fashion's customers claiming that his

former partners had "lost their minds" and committed "Black Mail." Defendants have, in concert, plundered First Fashion's most valuable assets, including its: a) famous SUNCREST trademark; b) trademarks delineating its distinctive hair piece models; c) famous HAIR BY MAIL trademark; d) "suncrestii.com" domain name; e) "hairbymail.com" domain name; and f) proprietary toll-free telephone number. As a result, customers have been confused and First Fashion has lost, incredibly, nearly 70% of its business, amounting to approximately $45,000 per month for the last several months. First Fashion requests immediate intervention from this Court in order to stop this hemorrhaging from continuing.

## I.     FACTS SUPPORTING ISSUANCE OF A PRELIMINARY INJUNCTION.

### A.     First Fashion is the owner of all common law rights in and to the SUNCREST mark.

Founded in 1997, First Fashion was incorporated by Wendy Wai Ying Leung Wan ("Wan") and Lee Tang Friendy ("Friendy"), along with Defendant Smith, for purposes of distributing throughout the United States high quality hair replacements (including toupees, wigs, and other hair pieces). (Declaration of Wendy Wan, submitted herewith, at ¶ 3). The hair replacements that First Fashion distributes are manufactured by a company, owned by Wan and Friendy, and distributed to wholesalers by a Chinese company, First Fashion (Hong Kong), which is owned by Friendy and operated by Wan and Friendy (hereinafter "FFHK") (Wan Decl., ¶ 3).

Wan has approximately 35 years of experience and Friendy has 45 years of experience manufacturing and selling hair replacement products throughout the world, including Canada, England, Germany, Sweden, Italy, Norway, Spain, Australia and New Zealand. (Wan Decl., ¶

4). They also sell to numerous wholesale distributors in the United States, which themselves sell the hair replacements to retailers. (Wan Decl., ¶ 4).

One of these U.S. wholesale distributors was BHRM, a company that is believed to have been wholly owned by Smith (Wan Decl., ¶ 5). In November 1997, Smith informed Wan and Friendy that his company, BHRM, was experiencing financial difficulties and that he would be closing the business. Smith proposed that he, Wan and Friendy start a new company, using BHRM's assets, to distribute hair replacement products in the United States. (Wan Decl., ¶ 6).

Accordingly, in November 1997, Wan, Friendy and Smith formed a new corporation, First Fashion, for the purpose of taking over BHRM's U.S. distributorship of hair replacement products. (Wan Decl., ¶ 7). It was expressly agreed that Smith would permanently discontinue BHRM's operations and that he would permanently refrain from competing with First Fashion. (Wan Decl., ¶ 7).[1]

Wan and Friendy each invested a substantial sum of start-up money and committed their extensive experience in the hair replacement industry to First Fashion. (Wan Decl., ¶ 8). In exchange for their contributions, Wan and Friendy were appointed as directors of First Fashion and were each assigned one-third of its stock thereby making them the controlling shareholders. (Wan Decl., ¶ 9).

Smith did not contribute financially to First Fashion, but instead contributed BHRM's good will, leasehold interest and equipment, customer list, and the trade name SUNCREST, which BHRM had used in previous years. (Wan Decl., ¶ 10). In exchange for Smith's contributions, and because he was the only one of the three shareholders who lived locally,

---

[1] Smith later told Wan that he kept BHRM as a registered company, but only for his own personal tax purposes. (Wan Decl., ¶ 7).

Smith was appointed President of First Fashion and was assigned the remaining one-third of its stock. (Wan Decl., ¶ 11).

Wan, Friendy and Smith all agreed, unconditionally, that their respective contributions were to become the exclusive property of First Fashion. (Wan Decl., ¶ 12). They also agreed that First Fashion would immediately commence business under the name SUNCREST so that customers familiar with FFHK would not be confused by the name of the new company that they had formed. (Wan Decl., ¶ 13). Thus, shortly after the new company was formed, Smith, as President of First Fashion, registered SUNCREST II as First Fashion's fictitious name. (Wan Decl., ¶ 14; Florida Department of State Fictitious Name Registration and Application attached thereto as Exhibit A).

**B.** **Since 1997, First Fashion has developed a huge customer base and substantial goodwill under the SUNCREST trademark such that the Mark has become widely recognized as the source of high quality hair replacement products.**

Since 1997, First Fashion has been the exclusive user of the SUNCREST mark for hair replacements. (Wan Decl., ¶ 15). Since 1997, First Fashion has sold hair replacements continuously under the SUNCREST name to over thousands of customers throughout the United States. (Wan Decl., ¶ 16). First Fashion's annual sales for the past five years have ranged from approximately $700,000 to $800,000 dollars. (Wan Decl., ¶ 17). Over the same period of time, First Fashion has spent substantial sums of money advertising and marketing its products each year under the SUNCREST trademark. (Wan Decl., ¶ 18).

Since at least as early as June 1999, First Fashion has advertised and sold its hair replacements under the SUNCREST mark on the internet using the domain name "suncrestii.com." (Wan Decl., ¶ 19).

As a result of its efforts, SUNCREST has become well-known and famous in the hair replacement industry as the source of high quality hair replacements. (Wan Decl., ¶ 20). Exemplars showing First Fashion's use of the SUNCREST mark are attached to the Wan Declaration.

### C.  First Fashion's Model Marks and HAIR BY MAIL mark.

First Fashion is also the owner of all rights in several trademarks designating various of its distinctive hair replacement models, including: SKIN GRAFT, GARY, ALL STAR, ALL PRO, MICRO PRO, and LACE GRAFT (collectively, the "Model Marks") that it has used continuously and exclusively since it began doing business in approximately November 1997. (Wan Decl., ¶ 21). The Model Marks have become well known within the hair replacement industry as an indication of source, namely that the products originated with First Fashion. (Wan Decl., ¶ 22).

In addition, First Fashion has, since at least as early as April 1999, advertised and sold its SUNCREST hair replacement products over the internet using the domain name "hairbymail.com." (Wan Decl., ¶ 23).

As a result of First Fashion's extensive advertising, substantial revenues, and widely regarded reputation, the Model Marks and the HAIR BY MAIL mark have, like SUNCREST, become famous and distinctive, and have acquired a secondary meaning as the source of premium, high-quality hair replacement products and services. (Wan Decl., ¶ 24). Examplars showing First Fashion's use of the Model and HAIR BY MAIL marks are attached to the Wan Declaration.

**D.** **Beginning shortly after the downturn in the economy in late 2008, Smith was discovered to have severely mismanaged First Fashion, including secreting company funds to his own personal accounts, and his employment was therefore terminated.**

Shortly after the economic downturn in late 2008, Wan and Friendy discovered that Smith, who had been running the day-to-day operations of First Fashion, had been severely mismanaging the company. (Wan Decl., ¶ 25). For example, Smith had permitted Cutsumbis, whom he had hired as the office manager, to order large quantities of hair replacement products with uncommon specifications from the factory even though there were no existing or prospective orders for these products. (Wan Decl., ¶ 26). As a result, Cutsumbis earned and was paid large commissions, but First Fashion was stuck with a backlog of unsold inventory and a large unpaid debt to the factory. (Wan Decl., ¶ 27).

In addition, Wan and Friendy discovered that Smith had been secretly transferring money from First Fashion's bank account to bank accounts controlled by Smith. (Wan Decl., ¶ 28; First Fashion's March 9, 2009 bank statement reflecting some of these transfers, attached as Exhibit G thereto). Because Smith managed the day-to-day operations of the company, he was able to engage in this misconduct undetected for a few months. (Wan Decl., ¶ 29).

Wan and Friendy were unaware of Smith's mishandlings of First Fashion until the beginning of 2009, when they discovered the large orders of uncommon products, referenced above, that Smith had placed and First Fashion's large outstanding debt to FFHK as a result of those orders. (Wan Decl., ¶ 30). After learning of these events they immediately began investigating. (Wan Decl., ¶ 30).

On February 17, 2009, during the time they were investigating, Smith sent Wan an irrational email offering to sell his share of First Fashion for $350,000 or buy hers and Friendy's share for a total of $25,000. (Wan Decl., ¶ 31; email attached thereto as Exhibit H). In this

email, Smith stated, "So, You! better come up with the money or LOOSE FACE and take my offer. No (sic) negations."

As a result of these gross mismanagement activities, in March 2009 Smith was removed as President and Director of First Fashion. (Wan Decl., ¶ 32). After being terminated, Smith immediately sent an email dated March 12, 2009 to Wan and Friendy stating, "You both are so stupid to think that you could get away with trying to remove me as President, where did you guys come from anyway?" (Wan Decl., ¶ 33; email attached thereto as Exhibit I). Smith even threatened Wan and Friendy in that same email: "Don't even dare to increase the charges agreed upon through the Quick Books Invoices. You cannot get away with even that without going to Jail." (Wan Decl., ¶ 34). Referencing products he was demanding that FFHK deliver to BHRM (not First Fashion), Smith wrote to Wan and Friendy, "If you do not send them immediately upon receipt of this E Mail, then I 'Will' see you in Jail as soon as you enter the United States of America the next time." (Wan Decl., ¶ 35).

Smith then engaged in a plan to disparage and defame First Fashion, Wan and Friendy by sending out to First Fashion's customers false and harmful letters, including distributing them with his new brochure, claiming that they had "lost their minds" and committed "Black Mail." (Wan Decl., ¶ 36; letter sent out in or about May 2009 to First Fashion's customers attached thereto as Exhibit J). Smith has attacked First Fashion and its principals, deliberately intending harm, even though he remains a one-third owner of the company.

### E. BHRM/Smith's and PC Solutions/Heilman's Infringement of the SUNCREST and Model Marks.

Immediately following his termination, Defendants began to pilfer First Fashion's trademarks, domain names and proprietary toll-free telephone number and began to unfairly compete with First Fashion in the hair replacement business. (Wan Decl., ¶ 37). Specifically, Smith began to operate his own company, believed to be the previously dormant BHRM, using First Fashion's SUNCREST and Model Marks to compete with First Fashion in the sale of hair replacement products. (Wan Decl., ¶ 38). For example, in Smith's May 2009 promotional brochure, Smith flagrantly infringes First Fashion's SUNCREST and Model Marks. (Wan Decl., ¶ 38; May 2009 promotional brochure attached thereto as Exhibit K).

Smith generated customer invoices for his company which bear the "Suncrest II" name, reflecting that he is attempting to confuse customers into believing that his company is associated with, sponsored by, or connected to First Fashion and its well-known SUNCREST Mark. (Wan Decl., ¶ 39). Further, Smith is representing himself as the President of "Suncrest Hair Replacement Manufacturers" and has misinformed First Fashion's customers about changes to its business, including that "Suncrest" is now "directly associated with" a factory in Indonesia. (Wan Decl., ¶ 40; Exhibit L thereto). Also, Smith is indiscriminately using "Suncrest" and "Suncrest II" on customer invoices. (Wan Decl., ¶ 40; Composite Exhibit M thereto).

Moreover, BHRM and Smith have, in concert with PC Solutions and Heilman, hijacked First Fashion's "suncrestii.com" domain name, and are using it to deceptively direct customers to their own website, where they advertise and sell products solely on behalf of Smith's "new" company, believed to be BHRM (the "Imposter Website"). (Wan Decl., ¶ 41).

BHRM and Smith have willfully, deliberately and wrongfully infringed upon First Fashion's rights as reflected in the Imposter Website as follows: a) the home page of the

Imposter Website uses First Fashion's SUNCREST and SUNCREST II Marks; b) Smith's photograph is prominently displayed near the SUNCREST Mark; and c) text on the website falsely states that SUNCREST is now affiliated with a "long time Korean friend in Indonesia." (Wan Decl., ¶ 42; exhibits referenced therein).

In addition, BHRM and Smith are unlawfully featuring on the Imposter Website all of First Fashion's Model Marks and have also hijacked First Fashion's proprietary toll-free telephone number that it has used since 1997, featuring it prominently on the Imposter Website and in other places, including on their product brochure. (Wan Decl., ¶ 43; Print-outs of First Fashion's Model Marks displayed on Imposter Site attached thereto as Exhibit N).

PC Solutions and Heilman, who own the "suncrestii.com" domain name registration, are acting in concert with BHRM and Smith in connection with the Imposter Website. (Wan Decl., ¶ 44). By letter dated May 5, 2009, First Fashion demanded that PC Solutions and Heilman transfer control of the suncrestii.com domain name to First Fashion; however, they have willfully and contemptuously refused to comply. (Wan Decl., ¶ 45; letter to Ken Heilman of PC Solutions attached thereto as Exhibit O).

As a result of Defendants' infringement of the SUNCREST and Model Marks, as well as their hijacking of the suncrestii.com domain name and proprietary toll-free telephone number, First Fashion has lost at least 70% of its sales volume, amounting to approximately $45,000 per month, reflecting that the vast majority of its customers are confused that BHRM/Smith's products and services originate with First Fashion, or that BHRM/Smith's products and services are sponsored by or affiliated with First Fashion. (Wan Decl., ¶ 46).

## F.    HBM/Cutsumbis/Killings/BHRM/Smith's Infringement of First Fashion's "hairbymail.com" mark.

In March 2007, during her employment with First Fashion, Cutsumbis, along with Killings, without First Fashion's knowledge or permission, incorporated Hair By Mail, Inc. (Wan Decl., ¶ 47; HBM's Articles of Incorporation attached thereto as Exhibit P).

In February 2009, immediately after Cutsumbis' employment was terminated, Cutsumbis and Killings, on behalf of their corporation, HBM, secretly registered the Florida trademark, HAIR BY MAIL. (Wan Decl., ¶ 48; Florida trademark application attached thereto as Exhibit Q). Cutsumbis and Killings have known that First Fashion is the owner of all common law rights in and to the "hairbymail.com" mark because Cutsumbis worked for First Fashion. (Wan Decl., ¶ 49). Nonetheless, Cutsumbis and Killings, on behalf of HBM, falsely certified themselves to the Florida Secretary of State as being the owners of the HAIR BY MAIL mark, to the exclusion of the rest of the world, and have unlawfully misappropriated it. (Wan Decl., ¶ 50).

Further, Smith, just several days after he was terminated from First Fashion, filed a Florida Fictitious Name Registration for "hairbymail.com." (Wan Decl., ¶ 51; fictitious name registration and application attached thereto as Exhibit R).

Defendants have misappropriated First Fashion's HAIR BY MAIL mark and are stealing First Fashion's customers and causing confusion concerning the source, sponsorship and affiliation of their products and services. Defendants are willfully and deliberately attempting to profit off of First Fashion's longstanding customer good will and reputation. There have been numerous instances of actual confusion between the Defendants' infringing marks and the HAIR BY MAIL Mark, SUNCREST Mark, and Model Marks, all of which has caused First Fashion

significant and substantial damage, including to its reputation and the good will of its trademarks.

## II.    <u>ARGUMENT</u>

A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." *International Cosmetics Exch., Inc.* v. *Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1246 (11th Cir. 2002) (internal quotation and citation omitted). In trademark cases, preliminary injunctions are routinely granted because of the presumption that "trademark infringement by its nature causes irreparable harm." *Levi Strauss & Co.* v. *Sunrise Int'l Trading Inc.,* 51 F.3d 982, 986 (11th Cir. 1995) (internal quotations and citation omitted); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir. 1998) ("trademark actions are common venues for the issuance of preliminary injunctions") (internal quotations and citation omitted). First Fashion is entitled to preliminary injunctive relief because each of the four elements weighs convincingly in its favor.

### A.    <u>First Fashion is Likely to Succeed on the Merits of its Claims.</u>

The claims pursuant to which First Fashion seeks injunctive relief fall into two categories:   (1) trademark infringement and unfair competition claims under federal and state law (Counts I, II, V and VIII); and (2) dilution claims under federal law (Counts III, IV and VI).

#### 1.    <u>First Fashion is Likely To Succeed on its Trademark Infringement Claims.</u>

First Fashion has asserted claims of trademark infringement/false designation of origin/unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Counts I,

II and V) and unfair competition under Florida common law (Count VIII). The central elements of these claims are essentially the same and require a plaintiff to show: (1) that its mark has priority; and (2) that defendant's mark is likely to cause confusion, mistake, or deception among purchasers, potential purchasers, and the relevant public and trade as to the source or sponsorship or approval of defendant's goods, and/or as to their affiliation with plaintiff. *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999) (setting forth elements for trademark infringement under Section 32(a) of the Lanham Act); *Planetary Motion, Inc.* v. *Techsplosion, Inc.,* 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) (setting forth elements of Section 43(a) claim and stating in footnote, "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition," quoting *Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F.2d 1519, 1521 (11th Cir. 1991)); *Monsanto Co. v. Campuzano (Nutrasweet Co),* 206 F.Supp. 2d 1252, 1267 (S.D. Fla. 2002) (holding that "[t]he legal standard for federal trademark and unfair competition, and for common law trademark infringement, are essentially the same") (citations omitted).

### i.     First Fashion's trademarks have priority.

Priority of use is established where a plaintiff: (1) first adopted the mark; and (2) used the mark in a way that the public sufficiently identifies or distinguishes the marked goods in an appropriate segment of the public mind as to the adopter of the mark. *See Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1195 (11th Cir. 2001).

"A trade mark symbolizes business good will. There is no property in a trade-mark apart from the business or trade in connection with which it is employed. The law of trade-marks is but a part of the broader law of unfair competition, the general purpose of which is to prevent one

person from passing off his goods or his business as the goods or business of another." *Bulova Watch Co. v. Steele*, 194 F.2d 567, 569 (5th Cir. 1952).

Upon formation, First Fashion purchased many of BHRM's assets, including, specifically, the SUNCREST trade name. In exchange, Smith received one-third of the corporation's stock. First Fashion immediately commenced use of the SUNCREST mark, including registration of the fictitious name "Suncrest II," a formative variation of the Mark. First Fashion has been using SUNCREST for hair replacement products continuously and exclusively in interstate commerce for more than 11 years.

Smith/BHRM only recently started using SUNCREST to identify their products in March 2009 after Smith was terminated from First Fashion. Thus, First Fashion clearly has priority of use of the SUNCREST mark.

Smith and/or BHRM may claim that they were the senior users of the SUNCREST mark. However, First Fashion is unaware of any evidence that BHRM, prior to 1997, ever commenced use of SUNCREST, or, if commenced, whether BHRM subsequently abandoned its use.

Even assuming, *arguendo*, BHRM had at one time used and did not abandon SUNCREST, ownership and goodwill of the mark was unconditionally transferred to First Fashion upon its formation in exchange for Smith's one-third ownership in the company. The law is clear that "[o]wnership of trademarks and service marks passes impliedly with ownership of the pertinent business with which the mark is associated, absent express provision to the contrary." *Plitt Theatres, Inc. v. American National Bank and Trust Co. of Chicago*, 697 F.Supp 1031, 1035 (N.D. Ill. 1988); 3 McCarthy on Trademarks & Unfair Competition § 18:23, (citing numerous cases holding that where an assignee buys a total business, including its physical

assets and customer lists, "there seems little doubt that it has purchased the 'good will' of the seller").

Moreover, since 1997, First Fashion has been the exclusive user of the SUNCREST mark. First Fashion is the one which has paid for all of the advertising and marketing, and which has derived all revenues, for products sold under the Mark. Neither BHRM nor Smith have any rights in and to SUNCREST.

Similarly, First Fashion is the one which created the Model Marks and the HAIR BY MAIL Mark. Those marks have been used exclusively and continuously by First Fashion since, respectively, 1997 and 1999. None of the Defendants used those marks prior to First Fashion, and thus First Fashion has priority of use.

First Fashion has used its SUNCREST mark in every facet of its business, including in product brochures, advertisements, and invoices. Before Defendants' unlawfully hijacked First Fashion's domain names, First Fashion, for many years, advertised and promoted its SUNCREST mark on the internet, including its suncrestii.com domain name. In addition, First Fashion advertised and sold its hair replacement products on its hairbymail.com website. Thus, First Fashion used its Marks in a way that the public sufficiently identified and distinguished its goods from those of others.

Accordingly, First Fashion has priority of use of SUNCREST, the Model Marks, and the HAIR BY MAIL mark.

### ii. Defendants' use of SUNCREST, the Model Marks and the HAIR BY MAIL mark is likely to cause confusion.

The likelihood of consumer confusion, mistake, or deception arising out of Defendants' use of First Fashion's marks is determined by evaluating the following factors: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the

parties' retail outlets (trade channels) and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion. *Frehling,* 192 F.3d at 1335. The Eleventh Circuit discourages district courts from determining "whether a likelihood of confusion exists by merely computing whether a majority of the subsidiary facts indicates that such a likelihood exists." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 840 n.17 (11th Cir. 1983). Rather, district courts "must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate fact decision." *Id.* Accordingly, "[there is no need to analyze each of these factors in every case ... because consideration of fewer than all seven factors can support a finding of likelihood of confusion." *Monsanto,* 206 F. Supp. 2d at 1262; *Univ. of Georgia Athletic Ass 'n v. Laite,* 756 F.2d 1535, 1543 (11th Cir. 1985) ("We never have held that a court must specifically mention each of the seven factors in order to avoid reversal on appeal."). Here, an examination of these factors leads to the inescapable conclusion that there is a likelihood of confusion, mistake or deception.

   ***Type of Mark.*** "Classifying the type of mark Plaintiff has determines whether it is strong or weak." *Frehling,* 192 F.3d at 1335 (11th Cir. 1999). Fanciful or arbitrary marks bear no relationship to the product with which it is associated and are considered the stongest types of marks. *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1357 (S.D. Fla. 1998). "Suncrest" is a coined term akin to "Toyota" or "Kodak," which has no independent meaning other than to identify source. Therefore, SUNCREST is a fanciful or arbitrary mark entitled to the greatest level of protection.

   The Model Marks, SKIN GRAFT, GARY, ALL STAR, ALL PRO, MICRO PRO and LACE GRAFT, also bear no relationship to hair replacement products and are arbitrary marks entitled to strong protection.

   A suggestive mark suggests some characteristic of the product or service to which it is

applied, but requires the consumer to use his imagination to determine the nature or the product or service. *Id.* Suggestive marks, like arbitrary marks, are inherently distinctive and do not require for protection evidence of secondary meaning. *Id.*

HAIR BY MAIL suggests a characteristic of First Fashion's products, namely that they can be mailed. However, consumers would need to use their imagination to determine that "Hair" refers to hair replacement products. Therefore, HAIR BY MAIL is an inherently distinctive suggestive mark.

Even assuming, *arguendo*, HAIR BY MAIL was a descriptive mark, it has acquired distinctiveness through secondary meaning. As described above, First Fashion has spent substantial amounts of money advertising and promoting the Mark, and has generated significant revenues. As such, consumers recognize HAIR BY MAIL as the source of high-quality hair replacement products, and the mark is therefore highly protected. *See id.*

*__Similarity of Marks.__* Here, the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used. *Frehling,* 192 F.3d at 1337. Concurrent use of the same trademark poses a substantial likelihood of confusion among consumers. *International Cosmetics Exch., Inc.* v. *Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1249-50 (11th Cir. 2002). Defendants have misappropriated First Fashion's marks in their entirety. Thus, this factor supports a likelihood of confusion.

*__Similarity of the Products the Marks Represent__* "This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling,* 192 F.3d at 1338. Further, "the greater the similarity between the products and services, the greater the likelihood of confusion." *E. Remy Martin & Co., S.A. v. Shaw-Ross*

*International Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir. 1985). Defendants are using First Fashion's marks in connection with the same products, namely, hair replacements, as First Fashion. Defendants are even using the same Model identifiers (i.e. the Model Marks) and have hijacked First Fashion's suncrestii.com and hairbymail.com domain names. This factor weighs strongly in First Fashion's favor.

    ***Similarity of the Parties' Retail Outlets and Customers.*** "This factor takes into consideration where, how, and to whom the parties' products are sold." *Frehling,* 192 F.3d at 1229. Defendants, like First Fashion, are wholesaling the identical hair replacement products as First Fashion. The products are advertised and marketed in brochures and over the internet and the customer base, hair retailers (and direct consumers for the HAIR BY MAIL mark) are the same.

    ***Similarity of Advertising Media Used.*** "This factor looks to each party's method of advertising." *Frehling,* 192 F.3d 1339. "If the plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1543 (11th Cir. 1986) (citation omitted). As stated above, Defendants are using the same advertising channels, namely product brochures and internet advertising, as First Fashion. *See Paccar, Inc. v. Telescan Technologies, LLC,* 115 F.Supp.2d 772, 778 (E.D. Mich. 2000) ("simultaneous use of the Internet as a marketing and advertising tool renders it more likely that consumer confusion will result"), *aff'd in relevant part,* 319 F.3d 243, 254 (6th Cir. 2003). Accordingly, this factor weights strongly in First Fashion's favor.

    ***Defendants' Intent.*** "Intent to copy in itself creates a rebuttable presumption of likelihood of confusion." *Babbit Elecs. v. Dynascan Corp.,* 38 F.3d 1161, 1179 (11th Cir 1994) (internal quotations and citations omitted); *Frehling,* 192 F.3d at 1340 ("If it can be shown that a defendant adopted a plaintiffs mark with the intention of deriving a benefit from

the plaintiffs business reputation, this fact alone may be enough to justify the inference that there is confusing similarity.") Intent may be shown through circumstantial evidence. *AmBrit,* 812 F.2d at 1543.

Defendants have acted in utter bad faith, willfully and deliberately intending to pilfer First Fashion's intellectual and proprietary property. For example, Defendants have known full well that First Fashion has exclusively used SUNCREST and the Model Marks since 1997 and HAIR BY MAIL since 1999. Nonetheless, shortly before or upon Smith's termination from First Fashion, Defendants, individually and/or in concert with each other, began deliberately to infringe First Fashion's marks. Smith started operating a "new" business, presumably his previously dormant company, BHRM, using SUNCREST and SUNCREST II and the Model Marks used by First Fashion since 1997. *See* Imposter Website, described above.

Smith's bad faith intent is further evidenced by the erratic emails he sent to Wan and Friendy. In particular, Smith's "offer" to sell his one-third share of First Fashion for $350,000, or, alternatively, to buy their two-thirds share for $25,000, reflects a very distorted and irrational behavior indicative of improper motives. Smith's threats to "see (Wan and Friendy) in Jail as soon as (they) enter the United States" and the disparaging letters distributed to First Fashion's customers stating that they had "lost their minds" and committed "Black Mail" all reveal a deliberate scheme to inflict harm upon, and to derive profit at the expense of, First Fashion.

Defendants Cutsumbis and Killings incorporated HBM while Cutsumbis was working for First Fashion and they registered the trademark at or around the time her employment was terminated. They knew full well that First Fashion has been the exclusive user of the HAIR BY MAIL mark, yet they fraudulently reported to the State of Florida that they were unaware of anyone else who had rights to the Mark.

PC Solutions and Heilman have exhibited bad faith because they refused to comply with First Fashion's demand that control of suncrestii.com be returned. Heilman informed Wan he would not take instructions from anyone other than Smith, whom he knew had opened a competing business using First Fashion's trademarks.

**Actual Confusion.** "The law is well settled in this circuit that evidence of *actual* confusion between trademarks is not necessary to a finding of *likelihood* of confusion, although it is the best such evidence." *E. Remy Martin,* 756 F.2d at 1529 (emphasis in original). Further, "due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Pita Delight, Inc. v. Salami,* 24 F.Supp.2d 795, 801 (E.D. Mich. 1998). First Fashion's sales have decreased by a whopping 70% since Smith commenced his unlawful activities impersonating First Fashion and stealing its trademarks. This is clear evidence that customers are actually confused that Smith and BHRM are affiliated or connected with, or sponsored by, First Fashion.

### 2. First Fashion is Likely to Succeed on its Dilution Claims.

First Fashion has asserted claims of dilution under Section 43(c) of the Lanham Act. Under the Trademark Dilution Revision Act of 2006 ("TDRA") (15 U.S.C. § 1125(c)), a plaintiff need only show that a defendant, at "any time after the owner's mark has become famous, commence[d] use of a mark or trade name in commerce that is *likely* to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1) (emphasis added).

"[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark is famous, the TDRA instructs courts to

RM:6542719:2

"consider all relevant factors," including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (4) the extent of actual recognition of the mark; and (5) whether the mark is federally registered. 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

First Fashion has used the SUNCREST mark, Model Marks and HAIR BY MAIL mark continuously, extensively and exclusively since, respectively, 1997 and 1999, to identify itself (and the high quality hair replacement products it promotes) in the United States and throughout the world including in its publications, marketing materials, over the internet, and in other media. Further, First Fashion's marks have established a widespread reputation for quality, and have become associated with First Fashion's goods and services in the minds of consumers. These marks have thus become famous within the meaning of 15 U.S.C. § 1125(c).

"'[Dilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). The TDRA instructs courts to "consider all relevant factors," including: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B).

To show "dilution by tarnishment," a plaintiff need only show an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation

of the famous mark." 15 U.S.C. § 1125(c)(2)(C). The similarity of First Fashion's marks and Defendants' marks cannot be disputed: they are identical. Further, because of First Fashion's many years of continuous, extensive, and exclusive use of SUNCREST, the Model Marks and the HAIR BY MAIL mark, those marks have established a widespread reputation for quality, and have become associated with First Fashion's goods and services in the minds of consumers.

Moreover, because Defendants sell products of inferior quality from factories in Indonesia rather than China, and because Defendants' use of the marks is likely causing confusion as set forth herein, Defendants are diluting First Fashion's reputation and goodwill. First Fashion is likely to succeed on its dilution claims.

**B.      First Fashion Will be Irreparably Harmed Absent the Preliminary Injunction It Seeks.**

In trademark cases, irreparable injury exists as a matter of law where a plaintiff shows a likelihood of confusion. *E. Remy Martin,* 756 F.2d at 1530 (11th Cir. 1985). The rationale behind this rule makes sense: "in trademark infringement cases... there is no[] adequate remedy at law to redress infringement" and, therefore, "infringement by its nature causes irreparable harm." *Tally-Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1029 (11th Cir. 1989) (internal quotations and citation omitted). First Fashion has shown above that Defendants' use of its marks is likely to cause confusion. Moreover, First Fashion is losing 70% of its business every month due to Defendants' unlawful misappropriation of its marks, including its domain names and proprietary toll-free telephone number. Accordingly, irreparable harm is presumed as a matter of law.

First Fashion is entitled to the relief it seeks even if irreparable harm is not presumed because, as the Eleventh Circuit has held, "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly

insist that its reputation should not be imperiled by the acts of another." *Ferrellgas Ptnrs., L.P. v. Barrow,* 2005 WL 1736276, *7 (11th Cir. July 26, 2005) (internal quotations and citations omitted). Indeed, as this Court recognized, "this Court is controlled by the Eleventh Circuit's declaration that 'irreparable harm exists in a trademark case when the moving party shows it will lose control over the reputation of its trademark pending trial.' " *Sony Computer Ent. Am. Inc. v. Nasa Elecs. Corp.,* No. 07-20819, 2007 U.S. Dist. LEXIS 78830, *6 (S.D. Fla. Oct. 24, 2007) *(quoting,* 147 F.3d at 1310). Here, Defendants are harming First Fashion's reputation through their unlawful conduct, thereby causing First Fashion to lose all control over the reputation of its mark and the reputation of its goods and services. Indeed, the injury strikes at the core of First Fashion's business, as unknowing consumers who associate First Fashion's marks, as wrongfully appropriated by Defendants, with the reputation of First Fashion, will be consistently confused. If Defendants are permitted to continue using First Fashion's marks, each such use will irreparably erode First Fashion's control over its marks and irreparably harm its reputation.

Further, First Fashion has no adequate remedy at law to cease Defendants' unlawful conduct. Without the relief it seeks, First Fashion will be compelled to prosecute a multiplicity of actions, one action each time Defendants commit an act infringement or other unlawful act, and in each such action it will be extremely difficult to ascertain the amount of compensation which will afford First Fashion adequate relief.

In light of the above, irreparable injury to First Fashion is guaranteed without the requested preliminary injunctive relief. Accordingly, First Fashion requests an expedited briefing schedule and a prompt evidentiary hearing on the Motion. First Fashion also requests that, pursuant to Federal Rule of Civil Procedure 26(d) and the Court's inherent power to manage discovery, that the Court enter an order permitting First Fashion to engage in discovery immediately so that the parties and uninterested third parties maintain documents germane to this

lawsuit.

## C. The Threatened Injury to First Fashion Outweighs the Harm an Injunction May Cause the Defendants.

While the injury to First Fashion is irreparable and immeasurable, there is no harm to Defendants - even if the injunction causes Defendants to lose revenue. As this Court has previously held, "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown to be infringing, such an argument in defense merits little equitable consideration." *Sony Computer*, 2007 U.S. Dist. LEXIS 78830 at \*8 *(quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)). Further, if the Court grants the requested relief, Defendants' business will not be harmed, as Defendants can select new, non-infringing marks to identify their businesses. Accordingly, the threatened harm to First Fashion overwhelmingly outweighs any harm the Defendants may experience - none - if the Court grants the requested relief.

## D. Granting the Injunction Would Not Disserve the Public Interest.

Granting the relief First Fashion seeks would not disserve the public interest but instead will further it because, in trademark cases, "the public interest will be served by the injunction by avoiding confusion in the marketplace." *Ferrellgas, ,* 2005 WL 1736276, \* 8 (11th Cir. July 26, 2005) (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001)); *Davidoff,* 263 F.3d at 1301 ("Consumers who purchase a particular product expect to receive the same special characteristics every time. The Lanham Act protects these expectations by excluding others from using a particular mark and making consumers confident that they can purchase brands without being confused or misled.") (citation omitted). Further, the public has an interest in protecting trademark owners, as "[a] trademark owner has spent time, energy and money in presenting a product to the public and building a reputation for that product." *Davidoff*

263 F.3d at 1301. The public interest will be served if the Court grants the requested relief because Defendants will be prohibited from confusing the public, and First Fashion's rights in its marks and its reputation will be protected. Accordingly, the public interest factor weighs heavily in First Fashion's favor.

### E.     First Fashion is Entitled to an Accounting of Defendants' Profits.

A plaintiff is entitled to recover Defendants' profits generated through its infringing and other unlawful conduct. 15 U.S.C. § 1117(a)(1). "In order for an infringer to be required to account for profits, he must only be shown to have acted deliberately or purposefully, for 'whether he believed himself to be within the law or not, he was knowingly and deliberately cashing in upon the good will of [the registrant.]' " *Monsanto,* 206 F. Supp. 2d at 1267 *(quoting Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir. 1988)). Further, the Supreme Court has held that profits may be included as part of compensatory relief despite the absence of a showing of pecuniary loss." *Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1521 (11th Cir. 1990) *(citing Leman v. Krentler-Arnold Hinge Last Co.,* 284 U.S. 448, 456-57, 52 S. Ct. 238, 2401-42, 76 L. Ed. 389 (1932); *Monsanto,* 206 F. Supp. 2d at 1267 ("The law in the Eleventh Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under 15 U.S.C. § 1117", *citing Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir. 1988)).    And, "the availability of an equitable profits remedy invokes the district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Levi Strauss,* 51 F.3d at 987 (11th Cir. 1995) (internal quotations and citations omitted) (holding that district court had the authority to freeze assets in trademark infringement action). The Court should now exercise its inherent equitable powers and order Defendants to account for the profits it received during the time they

unlawfully used First Fashion's marks.

## III.     <u>CONCLUSION</u>

For these reasons, First Fashion respectfully requests that the Court grant its Motion for Preliminary Injunction.

Dated: June 25, 2009

                Respectfully submitted,

                Respectfully submitted,

                RUDEN, McCLOSKY, SMITH,
                SCHUSTER & RUSSELL, P.A.
                Attorneys for Plaintiff
                15th Floor
                200 East Broward Boulevard
                Post Office Box 1900
                Fort Lauderdale, Florida 33302
                Phone: (954) 527-2492
                Fax:    (954) 333-4092
                matt.nelles@ruden.com
                jennifer.walker@ruden.com

By: _____
                 Matthew S. Nelles
                 Fla. Bar. No. 009245
                 Jennifer N. Walker
                 Fla. Bar. No. 0515051