UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60938-CIV-COHN/SELTZER

FIRST FASHION USA, INC.,

    Plaintiff,

vs.

BEST HAIR REPLACEMENT, MANUFACTURERS,
INC., EDWARD S. SMITH, JR., HAIR BY MAIL,
INC., BARBARA CUTSUMBIS, ANTHONY B.
KILLINGS, PC SOLUTIONS OF SOUTH FLORIDA,
INC., and KENNETH B. HEILMAN,

    Defendants.
_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court on Plaintiff First Fashion USA, Inc.'s Motion for Preliminary Injunction [DE 2]. The Court has considered the evidence presented at the hearing before this Court on July 22, 2009, the Motion and related exhibits, Defendants' Opposition [DE 42] and related exhibits, Plaintiff's Reply [DE 48] and related exhibits, the record in this case and is otherwise advised in the premises.

### I. BACKGROUND

On June 25, 2009, First Fashion USA, Inc.'s ("First Fashion") filed a Complaint [DE 1] against Defendants, which includes claims of (1) Trademark Infringement/False Designation of Origin pursuant to 15 U.S.C. § 1125(a); (2) Federal Trademark Dilution pursuant to 15 U.S.C. § 1125(c); (3) Cancellation of Trademark pursuant to Fla. Stat. § 495.101; (4) Unfair Competition under Florida law; and (5) Deceptive and Unfair Trade Practices pursuant to Fla. Stat. § 501.201.

Plaintiff also filed a Motion for Preliminary Injunction [DE 2]. Plaintiff's Motion

states that it is seeking an order enjoining Defendants from continuing to infringe and dilute First Fashion's famous and distinctive trademarks. (Motion at 1.) Plaintiff also requests that the Court order Defendants to return phone numbers, cease using specific email accounts and write a letter correcting certain misinformation that Defendants have distributed to customers of First Fashion. On July 17, 2009, Defendants Best Hair Replacement Manufacturers, Inc. ("BHRM") and Edward S. Smith, Jr. filed their Opposition to Plaintiff's Motion for Preliminary Injunction.[1] The primary defense raised in the Opposition is that the trademarks at issue are owned by Defendants BHRM and Smith rather than First Fashion. BHRM and Smith argue that First Fashion "was merely a licensee of the subject Marks" and, therefore, First Fashion "had no right . . . to the Marks upon termination of Smith's licensing agreement." (Opposition at 2.) Following the evidentiary hearing, the Court makes the following factual findings.

---

[1] Plaintiff voluntarily dismissed all Defendants other than BHRM and Edward S. Smith, Jr. On July 10, 2009, Plaintiff filed a Stipulation [DE 27] dismissing Defendants PC Solutions of South Florida, Inc. ("PC Solutions") and Kenneth B. Heilman. The Stipulation states that after reviewing the Complaint, PC Solutions and Mr. Heilman agreed to transfer the domain name registrations for suncrestii.com and hairbymail.com to Plaintiff. In addition, PC Solutions and Mr. Heilman represented that they are not otherwise using the Suncrest or Hair By Mail marks and agreed to cease and desist from ever using the marks. On July 15, 2009, Plaintiff filed a Stipulation [DE 34] dismissing Defendants Hair By Mail, Inc. ("HBM"), Barbara Cutsumbis and Anthony Killings. The Stipulation states that Cutsumbis is the incorporator, president and sole owner of HBM and that Killings is no longer involved in any capacity with HBM. The Stipulation further states that HBM owns a Florida Trademark and that there are several email accounts associated with HBM. After reviewing the Complaint, HBM and Cutsumbis agreed to (1) assign HBM's trademark registration to Plaintiff; (2) permanently dissolve HBM; (3) cancel the HBM email accounts; (4) destroy all materials and documents bearing the HBM trademark; (5) terminate and cancel all telephone directory listings and advertisements for HBM; and (6) forever cease and desist from using the HBM mark or any formative variation thereof.

## II. FINDINGS OF FACT

A. **The Formation of First Fashion**

1. Wendy Wai Ying Leung Wan and Defendant Smith became friends in 1975 as both were involved in the hair replacement industry.

2. Smith, who is now in his seventies, has "been in the business of hair replacement all [his] life." (DE 43 ¶ 1.)

3. Wan ran a business called First Fashion Hong Kong, which was a wholesale supplier of hair replacement products.

4. Smith was a customer of First Fashion Hong Kong.

5. On March 28, 1994, Smith established a wholly-owned company BHRM d/b/a Suncrest Hair Replacement Manufacturers. (DE 43 ¶ 2.)

6. In April of 1994, Smith designed and began using the trademark of Suncrest. (Id. ¶ 3.)

7. For example, on July 1, 1994, Smith produced a brochure that prominently used the name Suncrest. (Id.)

8. According to Wan, "[i]n November 1997, Smith informed Wan and Friendy that his company, BHRM, was experiencing financial difficulties and that he would be closing the business. Smith proposed that he, Wan and Friendy start a new company, using BHRM's assets to distribute hair replacement products in the United States." (DE 3 ¶ 6.)

9. First Fashion was incorporated in 1997 by Wan, Smith and Lee Tang Friendy. (Id. ¶ 3.)

3

10. First Fashion has a basic set of Articles of Incorporation, (see Plaintiff's Hearing Exhibit 1), however, there is no other written agreements amongst the principals.

11. Wan and Friendy each invested a substantial amount of inventory and made significant capital contributions to First Fashion. (DE 3 ¶ 8.)

12. Wan and Friendy were appointed as directors of First Fashion and were each assigned 1/3 of its stock. (Id. ¶ 8.)

13. "Smith did not contribute financially to First Fashion, but instead contributed BHRM's good will, leasehold interest and equipment, customer list, and the trade name SUNCREST, which BHRM had used in previous years." (Id. ¶ 10.)

14. In exchange, Smith received 1/3 of First Fashion's stock and was appointed as President of the company as he was the only shareholder that lived locally. (Id. ¶ 11.)

15. Smith was in charge of the day-to-day operations of First Fashion.

16. Smith also managed First Fashion's advertising and the use of the Suncrest trademark.

17. Both Wan and Friendy understood Smith to be contributing the entire business of BHRM to First Fashion, including all trademarks and good will.

18. Both Wan and Friendy testified that Smith never stated that anything was being excluded from First Fashion.

19. However, Smith testified that it was his understanding that he only allowed First Fashion to use the Suncrest trademark as long as he was President of First Fashion.

20. Smith acknowledged during his testimony that he never discussed trademarks

4

with Wan and Friendy.

21. Smith also acknowledged at his deposition there was never any licensing agreement amongst the parties, stating that there was "[n]ever any agreement, sir. It was my decision." (Deposition of Edward S. Smith, Jr ("Smith Depo.") at 256:8-9.)

22. It was agreed that Smith would discontinue BHRM's operations and that Smith would refrain from competing with First Fashion. (DE 3 ¶ 7; see also Smith Depo. at 102:5-8.)

23. Friendy, Smith and Wan also "agreed that First Fashion would immediately commence business under the name SUNCREST so that customers familiar [First Fashion Hong Kong] would not be confused by the name of the new company." (DE 3 ¶ 13.)

24. Shortly after the new company was formed, Smith, as President of First Fashion, registered SUNCREST II as a fictitious name. (Id. ¶ 14.)

25. Since at least as early as June 1999, First Fashion has advertised and sold its hair replacements under the Suncrest mark. (Id. ¶ 19.)

26. Employees of First Fashion answered the telephones by stating "Suncrest."

27. According to Wan, "SUNCREST has become well-known and famous in the hair replacement industry as the source of high quality hair replacements." (Id. ¶ 20.)

**B.** **Trouble at First Fashion**

28. According to Wan, "[s]hortly after the economic downturn in late 2008, Friendy and I discovered that Smith, who had been running the day-to-day operations of First Fashion, had been mismanaging the company." (Id. ¶ 25.)

29. Wan stated that "Smith had permitted [Barbara] Cutsumbis, whom he had hired as the office manager, to order large quantities of hair replacement products with uncommon specifications from the factory even though there were no existing or prospective orders for such products." (Id. ¶ 26.)

30. Wan further stated that "[a]s a result, Cutsumbis earned and was paid large commissions, but First Fashion was stuck with a backlog of unsold inventory and a large unpaid debt to the factory." (Id. ¶ 27.)

31. At his deposition, Smith testified that Wan and Friendy "noticed that there were irregularities on the books of $44,000, but that's not as much as it was." (Smith Depo. at 161:5-7.)

32. Smith estimated that the irregularities totaled approximately "150 to $300,000" and he testified that it was because Cutsumbis "had cooked the books." (Id. at 161:14.)

33. Due to these irregularities, Smith fired Cutsumbis. (Id. at 161:18-19.)

34. Smith changed the locks and the password to the security system preventing Wan and Friendy from accessing First Fashion's facilities.

35. Smith also engaged in eccentric behavior such as purchasing cars for all the employees of Smith's company. (Id. at 195:18-21.)

36. On February 17, 2009, as Wan and Friendy were investigating Smith's activities, Smith sent Wan an email offering to sell his shares of First Fashion for $350,000 or buy Wan's share for a total of $25,000. (DE 3 ¶ 31.)

37. Smith testified that Friendy offered to buy Smith's shares for $1,000,000, however, Smith determined that amount was too much and he informed Friendy

that he would accept $350,000.

38. Friendy denied ever making such an offer to Smith.

39. On February 17-18, 2009, Smith transferred money from First Fashion's account to accounts controlled by Smith. (See, e.g., DE 3 ¶ 28.)

40. Smith testified that, in total, he transferred $19,000 out of First Fashion's accounts into the accounts of BHRM. (Smith Depo. at 194:12-195:1; see also id. at 197:24-198:3.)

41. Smith testified that he intended to pay employees using that money. (Id. at 195:2-4.)

42. In March of 2009, Smith was removed as President and Director of First Fashion. (DE 3 ¶ 32.)

43. After he was removed, Smith sent a threatening email to Wan and Friendy in which Smith called them "stupid" and threatened that their actions could land them in "[j]ail." (Id. ¶¶ 33-34.)

44. According to Wan, "Smith then engaged in a plan to disparage and defame First Fashion, Friendy and [Wan] by sending out to First Fashion's customers false and harmful letters, including distributing them with his new brochure, claiming that [they] had 'lost [their] minds' and committed '[b]lack [m]ail.'" (Id. ¶ 36) (quoting Plaintiff's Hearing Exhibit 17.)

45. Wan further stated that "Smith began to operate his own company, believed to be the previously dormant BHRM, using First Fashion's SUNCREST and Model Marks to compete with First Fashion in the sale of hair replacement products." (DE 3 ¶ 38.)

46. For example, Smith produced a promotional brochure in May 2009 which employs the Suncrest trademark. (Id.)

47. In addition, Smith generated customer invoices which bear the "Suncrest II" name, "reflecting that he is attempting to confuse customers into believing that his company is associated with, sponsored by, or connected to First Fashion and its well-known SUNCREST Mark." (Id. ¶ 39.)

48. Further Smith and BHRM set up a competing website and began to use First Fashion's proprietary toll-free phone number. (Id. ¶ 43.)

49. Wan stated that "[a]s a result of Defendants' infringement of the SUNCREST, Hair By Mail, and Model Marks, as well as their hijacking of the suncrestii.com domain name and proprietary toll-free telephone number, First Fashion has lost at least 70% of its sales volume, amounting to approximately $45,000 per month, reflecting that the vast majority of customers are confused that BHRM/Smith's products and services originate with First Fashion, or that BHRM/Smith's products are sponsored by or affiliated with First Fashion." (Id. ¶ 46.)

50. Adrianne Robinson, an office manager for First Fashion for seven years, testified that First Fashion's customers are confused as a result of the actions of BHRM and Smith.

51. Wan also testified that if the troubles at First Fashion continue, she may have to close her factory in Hong Kong because First Fashion accounts for 40% of the factory's production.

52. The testimony of Wan and Friendy is often in conflict with Smith's testimony. After hearing the testimony and observing the demeanor of the witnesses, the

Court finds the testimony of Wan and Friendy to be more credible than Smith's for several reasons.

53. First, Smith demonstrated an arrogant cavalier attitude toward the proceedings. Smith was a hostile witness who made disparaging comments about Wan and Friendy during his deposition and his testimony at the hearing. Whereas, Wan and Friendy both appeared honest, conscientious, and forthright.

54. Second, certain portions of Smith's testimony appeared contrived and strained the truth. For example, Smith's testimony that Friendy offered to buy Smith's shares for $1,000,000 but he declined and informed Friendy that he would accept $350,000. In a marked contrast from these figures, Smith offered Wan $25,000 to purchase her shares of First Fashion on February 17, 2009. (DE 3 ¶ 31.)

55. Smith also testified that he was not happy with the quality of the hair replacement products provided by First Fashion and that Smith is now able to provide customers with higher quality products since he has parted ways with Wan and Friendy. However, this testimony is at odds with the undisputed fact that First Fashion was a successful business for nearly eleven years and Smith did not establish a history of similar complaints regarding the quality of First Fashion's products.

56. Finally, Smith's actions of changing the locks and the password to the security system and transferring money out of First Fashion's accounts run contrary to his obligation to deal in good-faith with his partners in First Fashion.

9

## III. CONCLUSIONS OF LAW

### A. Standard for Preliminary Injunction

In order to obtain a preliminary injunction, First Fashion must establish the following four elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest. Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994). Because a "preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." Id. (quoting Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)); see also McDonald's Corp. v. Roberts, 147 F.3d 1301, 1306 (11th Cir. 1998).

### B. Likelihood of Success and Irreparable Harm

There is no dispute that Defendants BHRM and Smith are using the Suncrest trademarks. In addition, not only is there is evidence that First Fashion customers are confused by the activities of Defendants, but Smith also distributed a letter which directly added to this confusion. There is also evidence that sales of First Fashion have decreased as a result of this confusion. The only real issue contested by Defendants, is whether Smith and BHRM transferred ownership of the marks in question to First Fashion or merely provided First Fashion a license to use the marks. If the Court determines that Smith and BHRM transferred ownership of the marks to First Fashion, then First Fashion has satisfied the first two elements required to obtain a preliminary

10

injunction, i.e., (1) a substantial likelihood of success on the merits and (2) a substantial threat that Plaintiff will suffer irreparable injury if the injunction is not granted.

The law presumes that when a business is conveyed, its trade name and good will are also conveyed. Plitt Theatres, Inc. v. American Nat'l Bank & Trust Co., 697 F. Supp. 1031, 1034-35 (N.D. Ill. 1988) ("Ownership of trademarks and service marks passes impliedly with ownership of the pertinent building or business with which the mark is associated, absent express provision to the contrary."). The reason for the presumption is that "[g]ood will has no existence except in connection with a going business; it cannot be separated from the going business to which it is incident." Pfleghar Hardware Specialty Co. v. Blair, 30 F.2d 614, 616-17 (2d Cir. 1929). "Unless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one to whom the business has been transferred." Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 670 F. Supp. 795, 798 (N.D. Ill. 1987), aff'd 871 F.2d 697 (7th Cir. 1989).

Here, the Court finds that Smith conveyed the business of BHRM to First Fashion and because there was no "express provision to the contrary," the trademarks associated with BHRM were also transferred to First Fashion. See Plitt Theatres, Inc. v. American Nat'l Bank & Trust Co., 697 F. Supp. at 1035. First, the objective facts lead to the conclusion that Smith conveyed the entire business of BHRM. This is based on the facts that Wan and Friendy both made significant contributions of capital and inventory as consideration for their respective shares in First Fashion. The *quid pro quo* for Smith's shares of First Fashion was the contribution of his business. Second, both Wan and Friendy understood that Smith was conveying his entire business to First

Fashion, including the trademarks. Third, Smith did not enter into an agreement or even discuss with Wan and Friendy the possibility that he would retain ownership of the trademarks.

Defendants argue that Smith only granted First Fashion an "implied license" to use the trademarks associated with BHRM. (See, e.g., Opposition at 4-6.) "[A]n implied license in fact 'arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.'" Birthright v. Birthright, Inc., 827 F.Supp. 1114, 1134 (D.N.J. 1993). Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made. See United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 140 n.7 (3rd Cir. 1981) ("[T]he district court found as facts that state and local chapters affiliated with the United States Jaycees were permitted during the term of affiliation to use the National's trade and service marks. Thus some type of license agreement existed."). An implied license is terminable at will. Coach House Restaurant, Inc. v. Coach & Six Restaurant, Inc., 934 F.2d 1551, 1563 (11th Cir. 1991). Smith argues that the he maintained control over the relevant trademarks as the President and manager of the day-to-day operations of First Fashion, as well as handling all of First Fashion's advertising. Smith argues that "the 'hand shake' agreement regarding Smith's contribution of his rights in the SUNCREST mark and any other mark in question was a revocable licensing agreement terminable at will upon Smith's removal from the day to day operations of [First Fashion]." (Opposition at 2.)

The Court rejects Defendants' argument. The evidence demonstrates that Smith

12

conveyed his entire business, BHRM, to First Fashion. "Smith transferred to First Fashion his prior business's lease, employees, office equipment, computers, customer list, toll-free telephone number, and Smith's full-time services as President of First Fashion." (Reply at 3.) Accordingly, there was a presumption that Smith also conveyed the relevant trademarks to First Fashion. Ferrellgas Partners, L.P. v. Barrow, 143 Fed. Appx. 180, 187 (11th Cir. 2005) ("Where the entire stock of a business is purchased and the business continued under its original name, it must be presumed that the purchaser acquired the goodwill of the business together with the commercial symbols of that goodwill, the business' trademarks and trade names."); Dovenmuehle v. Gilldorn Mortg. Midwest Corp., 871 F.2d 697, 700 (7th Cir. 1989) ("Absent contrary evidence, a business trade name is presumed to pass to its buyer."). Smith did not do anything to rebut this presumption such as entering into an agreement which expressly retained his rights in the trademarks. In fact, Smith testified that he did not discuss any trademark issues with Wan and Friendy at the time First Fashion was formed or otherwise. In American Sleek Craft, Inc. v. Nescher, 131 B.R. 991 (D. Ariz. 1991), the court rejected a defendant's argument that a trademark was licensed rather than conveyed finding that:

> [Defendant] did not present any evidence, even remotely suggesting that there was an oral license. Instead, the evidence establishes that when the corporation was formed, the parties simply assumed that [the new corporation] would use the trade names. ... In short, there is no evidence that, after the creation of [the new company], [defendant] ever claimed the names were his except in this dispute . . . .

American Sleek, 131 B.R. at 998.

Similarly here, "Smith never differentiated between SUNCREST, the mark used

13

by his prior business, and SUNCREST II, the mark used by First Fashion." (Id.) For example, after the company was formed, Smith continued to generate brochures, flyers and invoices for First Fashion bearing the Suncrest mark. In addition, employees of First Fashion answered the telephone by stating "Suncrest." The use of the Suncrest trademark in connection with First Fashion reflects that the principals of the company, including Smith, understood that BHRM's trademarks were transferred to First Fashion.

Lastly, the Court notes that much of the goodwill and product quality that is currently associated with the Suncrest trademark is attributable to the efforts of First Fashion over the past eleven years, as opposed to BHRM's operations which took place between 1994 and 1997.

### C. Potential Harm of Injunctive Relief to Defendants and Public Interest

Defendants argue that they "never intended to assign, transfer or abandon any interest in the Marks and maintain that they are the rightful owners;" therefore, granting a preliminary injunction is unwarranted because threatened injury to Plaintiff is outweighed by the potential harm to the Defendants. (Opposition at 11-12.) Given the Court's finding that BHRM's trademarks were conveyed First Fashion, the Court finds that the threatened injury to Plaintiff is greater if an injunction does not issue. The Court's conclusion is reenforced by the fact that Smith is still an owner of 1/3 of the stock of First Fashion. The Court also concludes that a preliminary injunction will decrease consumer confusion and, therefore, it will not disserve the public interest. In addition, the preliminary injunction will not prevent either First Fashion nor Defendants from continuing to provide products to customers. Accordingly, First Fashion has established the requisite elements and the Court will grant the requested injunctive relief.

14

## IV. CONCLUSION

Given the substantial discovery that has taken place, the parties are encouraged to engage in settlement negotiations or participate in a mediation prior to expending more time and resources. This case is particularly suited to a negotiated settlement given that the business arrangement was built on oral agreements and understandings rather than a written agreement for the Court to construe. Moreover, although the Court will enter a preliminary injunction, the Court suspects that some confusion amongst consumers will remain as long as this matter continues to be litigated. This confusion and the increasing litigation costs and fees will inure to the determent of First Fashion. Accordingly, it is in the financial interest of Smith, Wan and Friendy to resolve this matter as quickly as possible. The Court also notes that until the recent events described herein, the parties ran a successful business for over a decade and maintained a friendship that began long before First Fashion.

In light of the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. First Fashion's Motion for Preliminary Injunction [DE 2] is **GRANTED**.

2. Defendants, BHRM and Smith, including their employees, officers, agents, and all persons and entities in active concert or participation with any of them (collectively, "Enjoined Parties") are hereby enjoined from using, displaying, advertising or selling hair replacement products and services under, or otherwise doing business or holding themselves out to the public as, SUNCREST or HAIR BY MAIL, including all formative variations thereof, including "Suncrest II," and any mark confusingly similar thereto.

3. Enjoined Parties are hereby enjoined from using, displaying, advertising or

selling hair replacement products and services under the Model Marks defined in the Complaint (SKIN GRAFT, GARY, ALL STAR, ALL PRO, MICRO PRO, and LACE GRAFT), or otherwise doing business or holding themselves out to the public under the Model Marks, including all formative variations thereof, and any mark confusingly similar thereto.

4. Enjoined Parties shall immediately destroy all labels, signs, prints, packages, wrappers, receptacles, invoices, letterhead, business cards, stationary, advertisements, brochures, pamphlets and all other documents bearing the SUNCREST, HAIR BY MAIL and Model Marks, including all formative variations thereof, including "Suncrest II," suncrestii.com, and hairbymail.com.

5. Enjoined Parties are hereby enjoined from using the Florida fictitious name registration for "hairbymail.com."

6. Enjoined Parties are hereby enjoined from using the email accounts suncrest11@aol.com, hairbymail@aol.com, hairbymail1@aol.com, hairbymail4@aol.com, and any other email account containing the SUNCREST or HAIR BY MAIL Marks, or any formative variation thereof, and shall cancel those email accounts.

7. Enjoined Parties shall, within five days of the entry of this Order, transfer to First Fashion ownership and control of the following telephone numbers:
- SuncrestII: 1-800-357-6277 (toll free); 954-797-0436 (main line); 954-797-1822 (fax)
- Hair By Mail: 1-877-886-9045 (toll free)

8. Enjoined Parties shall, within five days of the entry of this Order, return to First Fashion the corporate book, including stock certificates, and all other corporate documents belonging to First Fashion.

16

9.    Enjoined Parties shall, within five days of the entry of this Order, distribute to their customers a letter withdrawing the defamatory statements Smith made in a letter distributed in May 2009 claiming First Fashion's principal owners, Wendy Wan and Lee Friendy had "lost their minds," had opened "another company of the same name as ours in North Miami Beach," and had committed "Black Mail." The letter shall also state that the Court has preliminary enjoined Defendants from using the SUNCREST and HAIR BY MAIL trademarks.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 28th day of July, 2009.

_____
JAMES I. COHN
United States District Judge

Copies furnished to:

Counsel of record via CM/ECF